1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

FRANK RICHMOND, MICHAEL
MCDERMOTT and KELLEY
MCDERMOTT, each individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

HOME PARTNERS HOLDINGS LLC, HP
WASHINGTON I LLC, HPA
BORROWER 2017-1 LLC, and
OPVHHJV, d/b/a PATHLIGHT
PROPERTY MANAGEMENT, SFR
Borrower 2022-2 LLC, and SFR Borrower
2021-2 LLC,

Defendants.

CASE NO. 22-5704-DGE-RJB

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

This matter comes before the Court on the Defendants' Motion for Summary Judgment.
Dkt. 124. The Court has considered the pleadings filed in support of and in opposition to the
motion and the file herein. Oral argument has been requested but would not be helpful to the
Court in deciding the motion.

The tenant-Plaintiffs in this case allege that the Defendants, a national real estate
investment and property management conglomerate, use illegal leases and engage in practices
that violate the Plaintiffs' rights under Washington's Residential Landlord Tenant Act, RCW
59.18, *et. seq.* ("RLTA"). Dkt. 95. The Plaintiffs contend that the Defendants breached their

duty of good faith and fair dealing and were unjustly enriched.  *Id.*  They seek damages, declaratory relief, injunctive relief, and other equitable relief.  *Id.*

The Defendants now move for summary judgment.  Dkt. 124.  For the reasons provided below, the motion (Dkt. 124) should be granted, in part, and denied, in part.

## I.    <u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

**A. FACTS**

1.   <u>Defendants, their Business, and the Named Plaintiffs Richmond and McDermotts</u>

Defendant Home Partners Holdings LLC ("Home Partners"), Home Partner's affiliates (Defendants HP Washington I LLC, HPA Borrower 2017-1 LLC, SFR Borrower 2022-2 LLC, and SFR Borrower 2021-2 LLC), and Home Partner's wholly owned subsidiary, Defendant Pathlight Property Management ("Pathlight") (collectively "Defendants") lease and manage single family homes in Washington through two programs.  Dkt. 127.  In the Lease Purchase Program, potential residents select a home either from Home Partner's inventory or from the Multiple Listing Service ("MLS").  *Id.* at 2.  Home Partner determines if the home is suitable for its program and, if the prospective resident is approved, both landlord and tenant enter a standard form "Lease and Right to Purchase Agreement."  *Id.*  Residents can lease the home for up to five one-year terms and have the option to purchase the home at predetermined prices.  *Id.*  In the second program, the Non-Right to Purchase Rental Program, Home Partners leases homes in its inventory for one-year terms using a standard lease form.  *Id.*  Defendant Pathlight handles the property management, including repairs and maintenance on the homes for both programs.  *Id.*

Plaintiff Frank Richmond and his family rented, with the option to purchase, a home from Home Partners in Port Orchard, Washington in September of 2021.  Dkt. 136-1.  The Richmonds moved out in September of 2022.  Dkt. 125-1 at 62.  Plaintiffs Michael and Kelley McDermott

1    rented a home from Home Partners, without the option to purchase, in July 2018.  Dkt. 136-2.

2    The McDermotts remain in the home, renting on a month-to-month basis.  Dkt. 125-6 at 9-12.

3           2.   Defendants' Leases and the Plaintiffs Richmond and McDermotts' Experiences

4           Defendants use standard form leases that, in large part, contain the same language.  Dkts.

5    136-1 at 7-45 (Plaintiff Frank Richmond's lease); at 136-2 at 2-29 (Plaintiffs Michael and Kelley

6    McDermott's lease).

7               a.   *Repair and Maintenance*

8           The Plaintiffs maintain that the Defendants' leases require the tenants to waive their

9    statutory rights and improperly shifts the burden of repair and maintenance to the tenants.  Dkt.

10   135.  The Plaintiffs point, in part, to the following section in the Defendants' form leases:

11         **10. MOVE-IN CONDITION OF PREMISES.**  Tenant confirms that it has
           physically inspected the Premises and acknowledges that the Premises are in good
12         order and repair and in a safe and clean condition.  No representations as to the
           condition or repair of the Premises have been made by the Landlord prior to or at
13         the execution of this Lease that are not contained in this Lease.  Tennant will be
           provided with a Move-In Condition Form . . . for the Premises on or before the
14         Commencement Date and . . . Tenant must sign and return one counterpart of the
           Condition Form to Landlord's agent on which Tenant must note all defects or
15         damage relating to the Premises existing as of the Commencement Date . . . .
           Tenant acknowledges that any damage to the Premises beyond normal wear and
16         tear which is not so noted on the Condition Form returned by Tenant will be
           presumed to have been caused by Tenant; therefore it is important to note any
17         such damage and to timely return the Condition Form.  Except for the covenants
           of Landlord expressly contained in this Lease or other documents executed by
18         Landlord, or as otherwise required or specified by Applicable Laws, Tenant
           agrees that (a) it is leasing the Premises in its **"AS-IS, WHERE-IS, WITH ALL**
19         **FAULTS"** condition as of the Effective Date and specifically and expressly
           without any warranties, representations or guarantees, either express or implied,
20         as to its condition, fitness for any particular purpose, merchantability or any other
           warranty of any kind, nature, or type whatsoever from or on behalf of Landlord,
21         and (b) except as may be required by Applicable Laws, Landlord has no
           obligation to perform any work, supply any materials, incur any expense or make
22         any alterations or improvements to any portion of the Premises.

23

24

Dkts. 136-1 at 13-14; 136-2 at 7 (*emphasis in original*).  The leases define "Applicable Laws," as "any and all laws, ordinances, statutes, rules, regulations, and orders of any and all governmental or quasi-governmental authorities or bodies applicable to the Premises. Dkt. 136-1 at 8; 136-2 at 3.  The Plaintiffs further point to the following provision in Defendants' form leases:

**16. MAINTENANCE AND REPAIR.** . . . Landlord shall use reasonable efforts to maintain, at its cost . . . (1) the foundations, roof, exterior walls, structural members, and mechanical systems (including HVAC systems, hot water heater, electrical and plumbing systems, and sump pump, if any) of the residence located at the Premises, in habitable condition, together with (2) any items which are required by Applicable Laws to be maintained by Landlord.  Landlord shall not be required to repaint, re-carpet, or re-finish the floors of the Premises either prior to or during the Term (unless same is included within "Landlord Work, in the Renovation Addendum for Landlord Work) nor to repair conditions caused by any Occupants.  Any appliances contained in the Premises are provided for the Tenant's convenience and except as required by Applicable Law, Landlord does not warrant the fitness or uninterrupted use or enjoyment of such appliances by Tenant and Landlord shall not be liable for any damages caused by such appliances' failure nor for their repair or replacement except Landlord shall exercise reasonable efforts to cause the following appliances to be in working order throughout the Term . . . to the extent same were provided by Landlord as of the Commencement Dates:  refrigerator, dishwasher, oven, stove. Landlord shall not be responsible for any appliance owned by Tenant.  To the extent permitted by Applicable Law, any interruption of Tenant's use and enjoyment of appliances shall not constitute "constructive eviction," nor form the basis for any defense, set-off or counterclaim by Tenant.  Tenant shall be responsible for the maintenance, repair and replacement of all appliances owned by Tenant and for all damage cause by them including if Tenant fails to remove any appliances from the Premises on or before the last day of the Term.  Nothing set forth herein is intended to abrogate or waive any obligations of Landlord required by Applicable Laws to repair conditions at the Premises.

**Tenant shall, at Tenant's expense, maintain the Premises (including all appliances, systems and fixtures located thereon but excluding only those items which are required to be maintained by Landlord)** and keep same in a clean, safe and healthy condition and in good working order, at all times during the Term, and shall suffer no waste therein, and shall be responsible for payment of the cost of (a) all repairs, maintenance or replacement required to the Premises, including the walls, windows, storms doors/windows and screens, ceilings, paint, plastering, plumbing work, pipes, appliances and fixtures belonging to the Premises, **whenever such damage or injury to the same shall have resulted from misuse, waste or neglect by any Occupant,** and (b) any and all repairs, maintenance or replacement required to the Premises that shall be necessary to

restore the Premises to the same condition as when Tenant took possession of the Premises . . . normal wear and tear excepted.  Landlord shall have the right to cause such repairs, maintenance or replacements described in this Section 16 to be made and recover all costs and expenses related thereto from Tenant as Additional Rent and shall be due and payable with the next Monthly Base Rent payment after receipt of notification from Landlord of the costs thereof.  Unless otherwise permitted by Applicable Laws, Tenant shall not, without the prior written consent of Landlord, have the right to make repairs to the Premises and set them off or deduct them against Rent due or otherwise withhold Rent (including Monthly Base Rent or Additional Rent).  **The amount of Rent was agreed upon based on the express understanding that the Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its costs in accordance with the terms of this Lease, the Landlord would have charged a higher rent amount.**

Tenant shall maintain the irrigation system, if any, garden, landscaping, trees, and shrubs located at the Premises and provide regular and routine landscape care. Tenant agrees to water . . . the lawn and landscaping . . .

Tenant shall, at Tenants' expense: . . . (ee) supply and immediately replace at Tenant's costs:  (1) all lightbulbs, . . . and batteries for smoke detectors and carbon monoxide detectors . . . and (2) air conditioning/furnace filters at least once every three (3) calendar months . . . and (gg) use reasonable efforts (including providing appropriate climate control) to maintain the Premises in such a condition as to prevent the accumulation of moisture and the growth of mold or mildew in the Premises and remove any standing water from the Premises. . . .

Dkts. 136-1 at 16-17; 136-2 at 9-10 (*emphasis in original*). The Defendants point out that the

leases also provide additional explanation regarding compliance with "Applicable Law:"

It is understood and agreed that notwithstanding anything contained in this Lease to the contrary, in the event any of Landlord's rights or remedies contained in this Lease are subject to, inconsistent with or are prohibited by the terms of Applicable Laws, then Landlord's rights and remedies shall be limited so that they comply with and shall be subject to such Applicable Laws.  Likewise, nothing contained herein is intended to limit or interfere with any rights which are expressly granted to Tenant pursuant to Applicable Laws and which are considered by such Applicable Laws to be non-waivable by Tenant.  In construing this Lease . . . no provisions . . . shall require the performance or waiver of any obligation or right, as applicable, which would violate Applicable Laws and any such provision shall be interpreted so as to comply therewith.  Notwithstanding any provision hereof to the contrary, the terms of this Lease shall be subject to, as limited by, and applicable only to the extent permitted under Applicable Laws.

1   Dkt. 136-1 at 11.  Further, to the extent any provision of the lease is "invalid or unenforceable

2   under Applicable Laws," the leases provide that "such an event shall not affect, impair or render

3   invalid or unenforceable the remainder of this Lease . . ."  Dkts. 136-1 at 22; 136-2 at 15.  The

4   remainder of the lease "shall remain in full force and effect as though any invalid or

5   unenforceable part was not written into this Lease."  *Id.*

6       With this lease language in mind, an examination of what happened to the named

7   Plaintiffs follows.  Home Partner's tenants, like the Richmonds and McDermotts, make repair

8   and maintenance requests through an online portal, by phone or email.  Dkt. 127 at 3.  Repair and

9   maintenance requests are managed by Defendant Pathlight (which again is a Home Partner

10  entity).  *Id.*  Pathlight employees did not come out to the Richmonds' or McDermotts' homes.

11              *i.       Plaintiff Richmond's Repair and Maintenance Issues*

12      On move-in, the Richmonds contend that they immediately had problems with the home.

13  Dkt. 136-9 at 2. They assert that the house was dusty, dirty, and filled with trash and the lawn

14  was overgrown.  *Id.* at 2-3.  There were taped joists, cracked areas in the walls, and ceiling fan

15  issues all of which were supposed to have been fixed but were not.  *Id.*  Interior painting was not

16  complete.  *Id.*  There was no refrigerator and Pathlight did not get a refrigerator to the

17  Richmonds for five days.  *Id.* at 3 and 13.

18      The Richmonds reported issues with their septic system in October of 2021 and in April

19  of 2022.  *Id.* at 7-9.  They maintain that Pathlight failed to respond within 24 hours.  *Id.*  The

20  Richmonds contend that during the fall incident, the family went the weekend without being able

21  to use their toilets and showers.  Dkt. 136-10 at 5.

22      The Richmonds also reported that after Defendants installed a new water heater, the

23  carbon monoxide alarm in the garage started going off.  Dkt. 136-9 at 6.  They reported it to

24

1   Pathlight.  *Id.*  Pathlight sent a vendor out to look at it who purportedly told the Richmonds that

2   the "ducting system for the exhaust was not up to code, that it was causing carbon monoxide to

3   back up into the garage, and that the ducting needed to be replaced."  *Id.*  Minor changes were

4   made to the system as a temporary fix.  *Id.*  The Richmonds contend that they reported to

5   Pathlight, and it denied their request to replace the ducting.  *Id.*  The alarm went off several more

6   times and while it was reported to Pathlight, "they never sent anybody out or responded."  *Id.* at

7   14-15.  When the alarm sounded the family would open the garage door.  *Id.*  Mr. Richmond

8   eventually duct-taped all the vent joints and the alarm no longer sounded.  *Id.* at 14.

9             ii.    *Plaintiffs McDermotts' Repair and Maintenance Issues*

10       The McDermotts also contend there were problems with their house when they moved in.

11   Dkts. 136-7 and 136-8.  The lawn was so overgrown and "Jurassic Park" like, to get it under

12   control and get rid of all the weeds, the McDermotts had to hire professionals to redo the lawn to

13   comply with their homeowner's association's requirements.  Dkt. 136-7 at 4.  There were also

14   broken sprinkler heads.  Dkt. 113 at 3.  They spent $1,600 out-of-pocket to address the yard.

15   Dkt. 136-7 at 8.  The McDermotts reported the issues to Pathlight and Pathlight refused to pay

16   for the repairs.  Dkt. 113 at 3.  The McDermotts also contend that the house was dirty when they

17   moved in, and they had to spend the day cleaning it.  *Id.*

18       The McDermotts' refrigerator and freezer broke several times.  Dkt. 136-8 at 2, 10-12.

19   They reported the problems to Pathlight, who paid for repairs.  *Id.*  On September 17, 2019, the

20   McDermotts reported that the refrigerator and freezer were not working at all.  Dkt. 125-8 at 2.

21   Pathlight sent a repair person, who recommended replacing the refrigerator.  Dkt. 125-8 at 4-5.

22   Pathlight ordered a new refrigerator three to six days after it was reported as not working (on or

23

24

1    around September 20, 2019-September 23, 2019) and the refrigerator was installed on October 3,

2    2019.  *Id.* at 9-10.  The family went over two weeks without a refrigerator.

3            The McDermotts reported a leak from the master bedroom that caused the living room

4    ceiling to bubble on May 18, 2019.  Dkt. 136-8 at 3.  It prevented them from being able to use

5    the master shower until it was fixed (Dkt. 136-8 at 8-9) on May 21, 2019.

6            On October 18, 2021, the McDermotts reported what looked like black mold growing on

7    the walls of the dining room.  Dkt. 136-8 at 13-15.  Pathlight sent a vendor out who reported it

8    was a "bigger issue" than the vendor thought.  *Id.* at 16.  A series of vendors were sent to the

9    house, and eventually, on November 2, 2021, Pathlight approved a vendor's repair bid, and it

10   started demolition.  Dkts. 136-8 at 16-19; 125-14 at 11.  More damage was discovered and the

11   siding on a portion of the front of the house had to be removed, which was done on November 5,

12   2021.  Dkt. 125-13 at 5-11.  According to the McDermotts, the house was "torn apart," walls

13   ripped out, flooring ripped out, and siding removed through August of 2022.  Dkt. 136-8 at 18-

14   26.  Portions of the home's front (from the crawl space all the way to the second story) was

15   covered in plywood and plastic tarping.  *Id.*  After the demolition, Pathlight struggled to find

16   vendors to complete the job.  Dkt. 125-16.  The McDermotts were unable to use the dining room,

17   that they used daily prior to the damage, and their daughter's bedroom, which was located right

18   above the dining room during that time.  Dkt. 136-8 at 25-26.  The Defendants did not give the

19   McDermotts a rent credit for the loss of the use of those spaces.  Dkt. 136-7 at 10.

20           After the mold remediation, the McDermotts asked Pathlight to clean the home's air

21   ducts.  Dkt. 136-7 at 11.  That request was denied as was the McDermotts' request that Pathlight

22   clear the gutters.  *Id.*

23                   b.   *Fees and the Named Plaintiffs Richmond and McDermotts' Experiences*

24

The Plaintiffs assert that the leases contain illegal "junk fees" as follows:

**Utility Billing Service Fee**.  Defendants' leases require tenants to pay a monthly utility billing service fee, ($9.95 for Richmonds) and ($7.95 for McDermotts).  Dkts. 136-1 at 8 and 12-13; 136-2 at 3 and 6.  The Richmonds and McDermotts were charged this fee.  Dkts. 136-1 and 136-2.  The Richmonds complained about this charge.  Dkt. 136-9 at 12.

**Heating Ventilation and Air Conditioning Filter Fee** ("HVAC filter fee").  From 2019 to November 2023, the leases provided for a mandatory monthly $15 "HVAC filter fee" in conjunction with Defendants' "Utility & Maintenance Reduction Program."  Dkts. 136-1 at 45; 136-4 at 2-3.  Through this program, tenants were supposed to receive HVAC filters every 60 days from a third-party vendor and as provided in the lease, were required to "properly install the filter(s) provided within two (2) days of receipt."  Dkt. 136-1 at 45.  By November 2023, tenants were given the option of opting out of the automatically sent filters ($15 fee).  Dkt. 136-4 at 2-3.  Even if the tenants opt out of the program, the leases still required that they change HVAC filters every two months.  Dkt. 136-5 at 2.

This $15.00 HVAC filter fee applied to the Richmonds.  Dkt. 136-1.  The McDermotts signed their lease in 2018 so this $15.00 charge was not in their lease. Dkt. 136-2.  The McDermotts purchased HVAC filters on their own.  Dkt. 125-1 at 115.

**Master Resident Liability Program Fee** ("insurance fee").  The leases require that tenants carry (1) general liability insurance coverage of at least $300,000 and (2) personal property insurance coverage.  Dkts. 136-1 at 14; 136-2 at 8.  Referred to as "Minimum Required Insurance," tenants have the option to obtain their own insurance, "which on an occurrence basis" must include (1) general liability coverage of at least $300,000 "covering tenant's legal liability for damage to the Landlord's property for no less than the following causes of loss: fire,

1    smoke, explosion, backup or overflow of sewer, drain or sump, water damage and falling

2    objects" and (2) personal property insurance.  Dkts. 136-1 at 31.  Home Partners (or one of its

3    subsidiaries as indicated in the lease) must be listed as an "additionally insured party."  *Id*.  If

4    tenants did not obtain their own insurance, they were automatically enrolled in the Master

5    Resident Liability Program and charged $13 a month.  *Id*.  Through this program, Defendants

6    agreed to purchase $100,000 of "property damage liability insurance . . . solely to bring Tenant

7    into compliance with the Minimum Required Insurance requirement."  *Id.*

8           The Richmonds acquired their own independent insurance but did not list Home Partners

9    as an "additionally insured party."  Dkt. 125-1 at 59-60.  This $13.00 insurance fee was charged

10   to the Richmonds, but they refused to pay it.  *Id*.  The McDermotts provided their own insurance

11   and were not charged this fee.  Dkt. 125-1 at 110.

12          **Late Fees.**  The Defendants' form leases require that monthly base rent as well as unpaid

13   fees (including the utility billing fee, HVAC filter fee, and insurance fee, defined under the

14   leases as "additional rent") be paid on the first of every month.  *See e.g.* Dkt. 136-1 at 8, 10-11,

15   12 (utility billing fee is "additional rent"), 13 (HVAC filter fee is "additional rent"), 31

16   (insurance fee is "additional rent").  If the monthly base rent and additional rent, collectively

17   defined by the leases as "rent," are not paid by the fifth of the month, late fees of either $20 or

18   10% of the applicable overdue payment amount, whichever is higher is charged.  *See e.g. Id.* at 9

19   (defining "rent" as the "monthly base rent" and "additional rent") and 11.

20          The Richmonds were assessed late fees because they did not pay the $9.95 utility billing

21   service fee and did not pay the $13.00 insurance fee or get renter's insurance listing Home

22   Partners as an "additionally insured party."  Dkt. 125-1 at 59-67.  The McDermotts were not

23   charged late fees.  Dkt. 125-1 at 109.

24

**Attorneys' Fees**.  The Defendants' form leases also provide that "[s]hould the Tenant fail to make timely Rent payments under this Lease, Tenant agrees to pay Landlord's costs and expenses incurred in collecting any such Rent, together with reasonable attorneys' fees to the extent permitted under Applicable Law."  Dkts. 136-1 at 11 and 136-2 at 5.

Months after they moved out, the Richmonds filed this case on September 21, 2022, and received a portion of their security deposit back on October 14, 2022.  Dkt. 1.  In May of 2023, the Richmonds received a call from a company called "Rent Debt" trying to collect a $250 debt on behalf of Pathlight.  Dkts. 112 at 9 and 136-3 at 2.  The debt was for a "legal fees recovery charge" to review the Richmond's ledger.  Dkt. 136-6 at 2.

On May 16, 2023, the Richmonds' counsel (who is representing them in this case) wrote Home Partners' counsel to dispute the $250 "legal fees recovery charge."  Dkt. 136-12.  On May 22, 2023, Pathlight (through counsel) informed the Richmonds that they were stopping all collection efforts on the $250 bill but did not confirm that the Richmonds did not owe the debt. Dkt. 136-13 at 2.  (The Defendants 30(b)(6) witness, in her February 12, 2024 deposition, also admitted that the Defendants did not retract the attorneys' fees charge.  Dkt. 136-27 at 8.) The McDermotts have not been charged for legal fees.

 **Security Deposits.**  The Defendants' form leases require tenants to pay a security deposit.  Dkts. 136-1 and 136-2.  According to the leases, the security deposit was to be held as "security for the complete performance by Tenant of each covenant and obligation under this Lease, including the timely payment of Rent."  Dkt. 136-1 at 5.

The Richmonds only received a portion of their security deposit back due to deductions for:  base rent, water, trash, "service fee," water utility recovery, utility billing service fee, late fee charge, and insurance fee.  Dkt. 136-14 at 2.  It is undisputed that no part of the security

deposit was retained for alleged damage to the property.  The McDermotts are current tenants, so no issue has arisen regarding their security deposit.

**B.  PROCEDURAL HISTORY**

This case was filed as a putative class action on September 21, 2022.  Dkt. 1.  No class has been certified; the Plaintiffs' motion to certify a class is pending.  Dkt. 116.  In their First Amended Complaint, the Plaintiffs alleged claims for RLTA violations, breach of the duty of good faith and fair dealing, unjust enrichment, and Washington Consumer Protection Act ("CPA") violations.  Dkt. 35.  The CPA claim was dismissed on April 5, 2023.  Dkt. 48.

The parties engaged in discovery.  On January 8, 2024, the Plaintiffs filed their Fourth Amended Complaint, alleging claims for violation of RLTA, breach of the duty of good faith and fair dealing, and unjust enrichment.  Dkt. 95.  They seek damages, declaratory relief, injunctive relief, and other equitable relief including:  rescission, restitution, and disgorgement.  *Id.*

**C.  PENDING MOTION**

The Defendants move for summary judgment on the Plaintiffs' claims for violation of RLTA, breach of the covenant of good faith and fair dealing, and unjust enrichment.  Dkt. 124.  They argue that the Plaintiffs' claims for equitable relief fail because the Plaintiffs have an adequate remedy at law.  *Id.*  Further, the Defendants argue that if any claims survive summary judgment, the Court should consider dismissing those claims for lack of subject matter jurisdiction because the amount in controversy may be below the jurisdictional minimum.  *Id.*  The Plaintiffs oppose the motion (Dkt. 135) and the Defendants have filed a reply (Dkt. 155).  The motion is ripe for decision.

## II.   DISCUSSION

**A.  SUMMARY JUDGMENT STANDARD**

1   Summary judgment is proper only if the pleadings, the discovery and disclosure materials

2   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

3   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is

4   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

5   showing on an essential element of a claim in the case on which the nonmoving party has the

6   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

7   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

8   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

9   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

10  metaphysical doubt").  Conversely, a genuine dispute over a material fact exists if there is

11  sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

12  the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986);

13  *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

14  The determination of the existence of a material fact is often a close question.  The court

15  must consider the substantive evidentiary burden that the nonmoving party must meet at trial,

16  which is a preponderance of the evidence in most civil cases.  *Anderson* at 254; *T.W. Elect.* at

17  630.  The court must resolve any factual issues of controversy in favor of the nonmoving party

18  only when the facts specifically attested by that party contradict facts specifically attested by the

19  moving party.  The nonmoving party may not merely state that it will discredit the moving

20  party's evidence at trial, in the hopes that evidence can be developed at trial to support the

21  claim.  *T.W. Elect.* at 630 (relying on *Anderson* at 255).  Conclusory, non-specific statements in

22  affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. Nat'l Wildlife*

23  *Fed.*, 497 U.S. 871, 888–89 (1990).

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**B. RLTA CLAIMS**

"The RLTA regulates the landlord-tenant relationship in Washington, imposing interdependent obligations on the parties to a residential lease and providing remedies for breaches of those duties." *Silver v. Rudeen Mgmt. Co., Inc.*, 197 Wn.2d 535, 538 (2021). It displaced several common law rules to "balance the bargaining positions between landlord and tenant in residential leasing—most notably by placing affirmative duties on the landlord, such as the warranty of habitability . . . ." *Id.* at 544. As a remedial statute, it must be construed liberally in favor of the tenant. *Id.* at 549.

    1.   <u>RLTA Claim based on Plain Language in Standard Leases that Improperly "Shifts" Repair and Maintenance Obligations from Defendants to Washington Tenants</u>

The Plaintiffs maintain that several provisions in the leases, Sections 10 and 16, in particular, violate various portions of the RLTA. The Defendants do not dispute that portions of the leases (read, they claim, out of context) appear to violate the RLTA but argue that the leases contain provisions that graft in Washington law (including the RLTA). *Id.* To the extent the lease provisions conflict with the law, they maintain that the leases provide that Washington law governs. Dkts. 124 and 155. The Plaintiffs argue that the leases do not incorporate the RLTA. Dkt. 135. They contend that even if the leases did, only the non-conflicting language is saved, and the non-conflicting language left makes the provisions at issue "nonsensical and any promise or obligation illusory." *Id.*

In Washington, interpretation of a contract is a question of law. *Woo v. Fireman's Fund Ins. Co.,* 161 Wash.2d 43, 52 (2007). Defined terms of a contract that comport with Washington law are applied as written. *Xia v. ProBuilders Specialty Ins. Co*., 188 Wn.2d 171, 182 (2017). Undefined terms are given their "plain, ordinary, and popular meaning." *Id.* at 181-182.

1    The leases incorporate the RLTA.  The leases' Sections 10 and 16 qualify the

2  requirements and obligations therein with phrases like ". . . except as required by Applicable

3  Law."  The leases define Applicable Law as "any and all laws, ordinances, statutes, rules,

4  regulations and orders of any and all governmental or quasi-governmental authorities or bodies

5  applicable to the Premises."  In turn, the leases define "premises," as "the real property (together

6  with improvements located thereon owned by the Landlord) having a street address of . . ."  The

7  Plaintiffs argue that the leases only discuss laws that apply to the "premises" and not the

8  landlord-tenant relationship, the relationship which is governed by the RLTA.  Dkt. 135.

9  Accordingly, they assert that the RLTA is not incorporated into the leases.  *Id.*  This argument is

10  unpersuasive.  Central to the landlord-tenant relationship is the "premises," or as defined in the

11  leases the "real property (together with improvements located thereon owned by the Landlord)."

12  The RLTA, in part, governs what is to occur on the "premises" – for example, who is responsible

13  for which repairs and which maintenance, etc.  Accordingly, the RLTA is applicable to the

14  premises and so is incorporated into the leases.  Further, the Plaintiffs fail to cite authority that

15  holds that, regarding "savings clauses" like the ones at issue, contracts must (as opposed to can)

16  expressly cite the laws the contracts are incorporating.

17    Moreover, the leases' provisions that conflict with the RLTA are invalid based on the

18  plain language of the leases. The leases provide that:

19       It is understood and agreed that notwithstanding anything contained in this Lease
         to the contrary, in the event any of Landlord's rights or remedies contained in this
20       Lease are subject to, inconsistent with or are prohibited by the terms of
         Applicable Laws, then Landlord's rights and remedies shall be limited so that
21       they comply with and shall be subject to such Applicable Laws.  Likewise,
         nothing contained herein is intended to limit or interfere with any rights which are
22       expressly granted to Tenant pursuant to Applicable Laws and which are
         considered by such Applicable Laws to be non-waivable by Tenant.  In construing
23       this Lease . . . no provisions . . . shall require the performance or waiver of any
         obligation or right, as applicable, which would violate Applicable Laws and any

24

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 15

such provision shall be interpreted so as to comply therewith.  Notwithstanding
any provision hereof to the contrary, the terms of this Lease shall be subject to, as
limited by, and applicable only to the extent permitted under Applicable Laws.

Dkt. 136-1 at 11.  The Plaintiffs maintain that, to the extent the leases' provisions are invalid and

stricken because they conflict with the RLTA, the remaining language is "nonsensical and any

promise or obligation illusory."  The Plaintiffs do not explain how inclusion of "nonsensical"

language or illusory promises or obligations violates the RLTA.  The grounds for this claim are

unclear.

While it appears clear that RLTA provisions are clearly enforceable in conflicts with

Defendants' form leases, it is less clear whether equitable considerations require that

Defendants' form leases should be modified to explicitly incorporate RLTA requirements into

the Defendants' form leases.  This issue is not fully argued in this motion, and should be left

open for further showing in connection with Plaintiffs' class certification motion.

Accordingly, Defendants' Motion for Summary Judgment should be granted in part as to

inclusion of RLTA provisions into existing issues of interpretation of the parties' contractual

relationships, but denied in part as to requirements to include the RLTA provision into new,

inclusive lease forms.

> 2. RLTA Claims regarding Maintenance and Repair Issues at the Richmonds' and
> McDermotts' Homes

The Defendants concede that there are issues of fact as to whether they violated the

RLTA regarding at least some of the maintenance and repair issues at both the Richmonds' and

McDermotts' homes.  Dkt. 124.  Accordingly, to the extent the Defendants move for summary

judgment on this portion of the Plaintiffs' RLTA claims, the motion should be denied.  There is

no need to rule on each of the maintenance and repair events in order to deny the motion for

summary judgment on these claims.

1

2

3. <u>RLTA Claims Related to Fees Charged</u>

      *a.   Monthly Utility Billing Service Fee, HVAC Filter Fee, and Insurance Fee*

3

4

5

6

7

8

      The Defendants move to dismiss the RLTA claims based on the monthly utility billing service fee (paid by both the Richmonds and McDermotts), HVAC filter fee (paid by the Richmonds), and the insurance fee (paid by the Richmonds).  Dkt. 124.  They contend that each of these fees were disclosed in the leases and that, as found by this Court in the April 5, 2023 Order Granting Partial Motion to Dismiss, these fees constitute "rent" as defined by the RLTA. *Id.*  The Plaintiffs do not directly address the Court's April 5, 2023 finding.  Dkt. 135.

9

10

11

12

      The Defendants' motion for summary judgment on the Plaintiffs' RLTA claims based on the charges for the utility billing service fee, HVAC filter fee, and insurance fee (Dkt. 124) should be granted.  Whether the utility billing service fee, HVAC filter fee, insurance fee constitutes "rent" under RLTA has already been determined.  Dkt. 48.

13

14

15

16

17

18

19

20

21

22

      The finding at issue was in the April 5, 2023, order granting, in part, and denying, in part, the Defendants' partial motion to dismiss.  Dkt. 48.  As is relevant here, the Plaintiffs' CPA claims were dismissed because RLTA provides the applicable rights and remedies, to the exclusion of the CPA, under Washington law.  *Id.* at 9-10.  In dismissing the CPA claims, this Court found that the utility billing service fee, HVAC filter fee, and insurance fee were "covered" by RLTA based, in part, on the statute's definition of "rent," finding that they are "recurring and periodic charges identified in the rental agreement."  Dkt. 48 at 10.  That order noted that the RLTA defines "rent" as: "recurring and periodic charges identified in the rental agreement for the use and occupancy of the premises, which may include charges for utilities."  RCW 59.18.303(29).  RLTA's definition of "rent" excludes "nonrecurring charges for costs

23

24

incurred due to late payment, damages, deposits, legal costs, or other fees, including attorneys' fees." *Id.*

The law of the case doctrine controls this issue.  The law of the case doctrine ordinarily precludes reconsideration of a previously decided issue by the same court or higher court in an identical case.  *U.S. v. Alexander,* 106 F.3d 874 (9th Cir. 1997).  "For the doctrine to apply, the issue in question must have been decided either expressly or by necessary implication in the previous disposition."  *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)(*cleaned up*).

The Court's April 5, 2023 finding that the claims based on the utility billing service fee, HVAC filter fee, and insurance fee were covered by RLTA based on RLTA's definition of "rent," necessarily decided that those three fees were "rent" as defined in the statute.  *Thomas* at 154.  Under RLTA, tenants are obligated to pay rent in accord with the lease.  RCW 59.18.130 (1).  The Plaintiffs' arguments amount to a motion for reconsideration of the prior determination and do not comply with West. Dist. of Washington Local Civil Rule 7(h).  The Plaintiffs' RLTA claims based on the utility billing service fee, HVAC filter fee, and insurance fee should denied, and those claims dismissed.

### b.  Attorneys' Fees Charged to the Richmonds

The leases provide that "[s]hould the Tenant fail to make timely Rent payments under this Lease, Tenant agrees to pay Landlord's costs and expenses incurred in collecting any such Rent, together with reasonable attorneys' fees to the extent permitted under Applicable Law." Dkts. 136-1 at 11 and 136-2 at 5.  Under RCW 59.18.230 (2)(c), "[n]o rental agreement may provide that the tenant . . . agree to pay the landlord's attorneys' fees," except as permitted under the RLTA.  The Defendants do not point to a provision of the RLTA that permits the attorneys' fees charged to the Richmonds.  The RLTA further provides that:

> A provision prohibited by subsection (2) of this section included in a rental agreement is unenforceable. If a landlord knowingly uses a rental agreement containing provisions known by him or her to be prohibited, the tenant may recover actual damages sustained by him or her, statutory damages not to exceed two times the monthly rent charged for the unit, costs of suit, and reasonable attorneys' fees.

RCW 59.18.230 (3).

The Defendants' motion for summary judgment on Plaintiff Richmond's RLTA claim based on the attorneys' fees charge should be denied. The Defendants contend that, to the extent this portion of the lease conflicts with the RLTA, the provision is invalid based on the express terms of the lease and the RLTA's requirements control. Yet, the Defendants still charged the Richmonds the fees which is arguably contrary to the RLTA. The Defendants argue that Plaintiff Richmond did not have to pay the charge so has not been harmed by it. The Defendants' argument is unavailing. The attorneys' fees were charged in December 2022 and a debt collector attempted to collect the debt by phone in May of 2023. Further, it was only after Plaintiff Richmond engaged his counsel to dispute the charge that the Defendants agreed to stop attempting to collect it. The Defendants have never confirmed that the debt is not owed. Further, to the extent the Defendants now assert that the attorneys' fees debt is not owed, their concession is too late – it came well after the case was filed. Plaintiff Richmond's claim is not moot – his interest existed at the time he filed the case and the Defendants have not made him whole as required under the statute. Defendants' Motion for Summary Judgment should be denied on this issue.

### c. Late Fee Charges to the Richmonds

The RLTA provides that a landlord may charge late fees for rent if it is more than five days past due. RCW 59.18.170. It further provides that a "landlord must first apply any

1 payment made by a tenant toward rent before applying any payment toward late payments,

2 damages, legal costs, or other fees, including attorneys' fees."  RCW 59.18.283 (1).

3       The Defendants' form leases require that monthly base rent as well as unpaid fees

4 (including the utility billing service fee, HVAC filter fee, and insurance fee, defined under the

5 leases as "additional rent") be paid on the first of every month.  *See e.g.* Dkt. 136-1 at 8, 10-11,

6 12 (utility billing service fee is "additional rent"), 13 (HVAC filter fee is "additional rent"), 31

7 (insurance fee is "additional rent").  If the monthly base rent and additional rent, collectively

8 defined by the leases as "rent," *(Id.* at 9 (defining "rent" as the "monthly base rent" and

9 "additional rent")), are not paid by the fifth of the month, late fees of either $20 or 10% of the

10 applicable overdue payment amount, whichever is higher is charged, per month, for each month

11 that any portion of such overdue payment amount remains delinquent. *Id.* at 11.

12       The Defendants' summary judgment motion on this claim should be denied.  The

13 Richmonds were assessed late fees because they did not pay the $9.95 utility billing service fee

14 and did not pay the $13.00 insurance fee or get renter's insurance listing Home Partners as an

15 "additionally insured party."  Dkts. 125-1 at 59-67 and 136-3 at 2-4.  As provided above, under

16 the law of this case alone, both these charges are "additional rent" under the leases and under the

17 RLTA.  That does not end the inquiry.

18       Although the charges (monthly base rent and additional rent) and the Richmonds'

19 monthly payment amounts did not change, the monthly late fee charge increased every month.

20 Dkt. 136-3.  Viewing the record in a light most favorable to the Plaintiffs, the Defendants were

21 charging late fees on the late fees, contrary to RCW 59.18.170 which provides that late fees can

22 be charged only on "rent."  RLTA's definition of "rent" excludes "nonrecurring charges for costs

23 incurred due to **late payment**, damages, deposits, legal costs, or other fees, including attorneys'

24

fees." RCW 59.18.303(29)(*emphasis added*).  Further the Defendants were applying payments to any overdue balance before they applied payments to rent, arguably contrary to RCW 59.18.283(1).  Accordingly, the motion for summary judgment should be denied on this claim.

### d.   The Richmonds' Security Deposit Retention

Under the RLTA, no security deposit may be collected by a landlord unless a written checklist is provided by the landlord to the tenant at the beginning of the tenancy "specifically describing the condition and cleanliness of or existing damages to the premises, fixtures, equipment, . . ."  RCW 59.18.260.  It further provides that within 30 days of the rental agreement's termination, "the landlord shall give a full and specific statement of the basis for retaining any of the deposit, and any documentation required by (b) of this subsection, together with the payment of any refund due the tenant under the terms and conditions of the rental agreement. . . ."  RCW 59.18.280(1)(a).  Subsection (b) of RCW 59.18.280, requires that "[w]ith the statement required by (a) of this subsection, the landlord shall include copies of estimates received or invoices paid to reasonably substantiate damage charges. . ."  The RLTA further provides that "[t]he requirements with respect to checklists and documentation that are set forth in RCW 59.18.260 and this section do not apply to situations in which part or all of a security deposit is withheld by the landlord for reasons unrelated to damages to the premises, fixtures, equipment, appliances, and furnishings, such as for rent or other charges owing."  RCW 59.18.280(4).

The Defendants' motion for summary judgment on the Plaintiff Richmond's claim for violation of RCW 59.18.280(1)(a) should be denied, in part, and granted, in part.  While Plaintiff Richmond did not have any amounts withheld from his security deposit for damage to the property, he was charged, in part, a "service fee."  Dkt. 136-14 at 2.  There are issues of fact as to

whether that explanation constitutes a "a full and specific statement of the basis for retaining" that portion of the deposit.  RCW 59.18.280(1)(a).  To the extent the Plaintiff Richmond bases his RLTA claim on failure to comply with RCW 59.18.280(1)(a)'s requirements regarding providing a specific statement of the basis for retaining withholding a portion of the deposit, summary judgment should be denied.

There is no allegation that any of the deposit was retained for damage.  The requirements for checklists and documentation regarding the condition of the property and costs of repairs found in RCW 59.18.260 and RCW 59.18.280(b) do not apply to Richmond's claim.  RCW 59.18.280(4).  To the extent the Plaintiff Richmond bases his RLTA claim on failure to comply with RCW 59.18.280(1)(a)'s requirements regarding withholding a portion of the deposit for damage to the property, summary judgment should be granted and the claim dismissed.

4.  <u>Motion for Summary Judgment regarding Claims for Declaratory and Prospective Injunctive Relief based on RLTA Claims</u>

The Defendants' motion for summary judgment on Plaintiffs' claims for declaratory relief and prospective injunctive relief on their RLTA claims (Dkt. 124) should be denied.  The Plaintiffs acknowledge that their claims for declaratory relief and injunctive relief are based on their RLTA claims.  There are issues of fact as to the Plaintiffs' RLTA claims.  Summary judgment on a portion of the relief they seek regarding those claims is premature.

**C.  BREACH OF GOOD FAITH AND FAIR DEALING CLAIM**

In Washington, "[t]here is in every contract an implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance."  *Rekhter v. State, Dep't of Soc. & Health Servs*., 180 Wn.2d 102, 112–13 (2014)(*internal quotation marks and citations omitted*).  The duty of good faith and fair dealing does not add or contradict express contract terms; instead it "arises only in connection with terms

1   agreed to by the parties." *Id*. at 113.  It does not require that a plaintiff show that a particular

2   contractual term is breached.  *Id.* at 112.  The "duty of good faith and fair dealing arises when the

3   contract gives one party discretionary authority to determine a contract term."  *Id.* at 113.

4        The Defendants' motion for summary judgment on the Plaintiffs' claims for breach of the

5   duty of good faith and fair dealing should be granted, in part and denied, in part.  The Plaintiffs

6   argue that "Defendants ongoing rent and fee charges are based on their exercise of discretion in

7   interpreting the leases and other 'Applicable Law' and their own business needs."  Dkt. 135.

8   There is no showing that the Defendants had discretion in determining which of the "Applicable

9   Law[s]" apply.  Further, most of the charges were disclosed in the Defendants' form leases and

10  were not discretionary: monthly base rent ($3,060.00 for Richmonds)(Dkt. 136-1 at 7) and

11  ($3,195.00 for McDermotts)(Dkt. 136-2 at 2), utility billing service fee ($9.95 for

12  Richmonds)(Dkt. 136-1 at 8 and 12-13) and ($7.95 for McDermotts)(Dkt. 136-2 at 3 and 6), the

13  HVAC filter fee ($15.00 charged to the Richmonds)(Dkt. 136-1 at 45), the insurance fee ($13.00

14  charged to the Richmonds)(Dkt. 136-1 at 31); and the manner to calculate the late fee (charged to

15  the Richmonds)(Dkt. 136-1 at 11).  To the extent the Plaintiffs base their breach of the duty of

16  good faith and fair dealing on those charges, the claim should be dismissed.

17       To the extent the Plaintiffs base their claim on the attorneys' fees provision of the lease,

18  the Plaintiffs' breach of the duty of good faith and fair dealing claim should not be dismissed.

19  The amount of attorneys' fees to be charged was not disclosed in the lease but was left to the

20  Defendants' discretion to determine how much of the fee to pass on to the Tenant.  There are

21  issues of fact as to whether this attorneys' fee charge was reasonable.  Further, if the RLTA

22  provisions are grafted into the lease which prohibited these charges, there are issues of fact as to

23

24

1  whether this attorneys' fees charge to the Richmonds violated the Defendants' duty of good faith

2  and fair dealing.

3  **D.  UNJUST ENRICHMENT CLAIM**

4  The Defendants argue that the Plaintiffs' claims for unjust enrichment fail because an

5  express contract governs the parties' relationships.  Dkt. 124.  "Unjust enrichment is the method

6  of recovery for the value of the benefit retained absent any contractual relationship because

7  notions of fairness and justice require it."  *Young v. Young*, 164 Wn.2d 477, 484 (2008).

8  The Defendants' motion for summary judgment on the Plaintiffs' claims for unjust

9  enrichment should be granted.  While the Plaintiffs contend in their response to the motion for

10  summary judgment that they do not have a contract with some of the defendants, the Defendants

11  properly point out that the Plaintiffs have repeatedly asserted (in their complaints, including the

12  operative complaint the Fourth Amended Complaint, various motions and responses to motions

13  and in their motion to certify a class) that they have a contract with the Defendants.  The

14  Plaintiffs' judicial admissions foreclose them from changing their position now.  Further,

15  contrary to their assertions, the Plaintiffs have not shown that all provisions in the leases are

16  completely "illegal, unenforceable and void."  The unjust enrichment claim should be dismissed.

17  **E.  RETROSPECTIVE INJUNCTIVE RELIEF AND EQUITABLE RELIEF CLAIMS**

18  The Defendants move for summary judgment on the Plaintiffs' claims for retrospective

19  injunctive relief, and on the claims for equitable remedies of rescission, restitution, and

20  disgorgement, arguing that the Court does not have federal equitable jurisdiction over those

21  claims because the Plaintiffs have an adequate remedy at law – damages.  Dkts. 124 and 155.

22  In the Ninth Circuit, plaintiffs must establish that they lack an adequate remedy at law

23  before securing equitable remedies in federal court.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d

24

834, 844 (9th Cir. 2020).  To the extent they make claims for retrospective injunctive relief and claims for the equitable remedies of rescission, restitution, and disgorgement, they have failed to make such a showing.  In their Fourth Amended Complaint, they assert a claim for damages to compensate them for their past losses.  They fail to demonstrate how those damages claims for the same harms for which they seek retrospective injunctive relief and equitable remedies are inadequate or incomplete.  This ruling does not apply to the Plaintiffs' claims for prospective injunctive relief, which is addressed in Section II.B.4. "Motion for Summary Judgment regarding Claims for Declaratory and Prospective Relief based on RLTA Claims."  (*See* page 22, lines 16-22, *et seq.*)

## F.  SUBJECT MATTER JURISDICTION

If the Court grants summary judgment or part of the motion for summary judgment, the Defendants move to dismiss the case, arguing that the Court may no longer have jurisdiction because the amount in controversy may not be met. Dkt. 124.  They contend that if the only claims remaining are the Plaintiffs' individual RLTA claims for maintenance and repair violations, the amount at issue may be under the jurisdictional threshold.

As stated above, the motion for summary judgment should be granted, in part, and denied, in part.  It is not clear that the amount in controversy is under the jurisdictional threshold. Further, while this case has not been certified as a class action, a motion to certify a class is pending.  It is premature to determine whether the Court has subject matter jurisdiction under the Class Action Fairness Act.  The Defendants' motion for summary judgment on this issue should be denied.

## III.   ORDER

Therefore, it is hereby **ORDERED** that:

The Defendants' Motion for Summary Judgment **IS:**

- **GRANTED IN PART** as to the following claims and those claims **ARE DISMISSED**:

    o Residential Landlord Tenant Act claims based only on the (a) inclusion of Residential Landlord Tenant Act provisions into existing issues of interpretation of the parties' contractual relationships, (b) monthly utility billing service fees, HVAC filter fees, and insurance fees, and (c) the security deposit retention based on damage to the property,

    o Breach of the duty of good faith and fair dealing claim except to the extent the Plaintiffs base their claim on the attorneys' fees charges,

    o Unjust enrichment claim,

    o Claims for retrospective injunctive relief,

    o Claims for equitable remedies of rescission, restitution, and disgorgement, and

- **DENIED** in all other respects, including format requirements for Defendants' form leases.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 2nd day of July, 2024.

ROBERT J. BRYAN
United States District Judge